File Date: July 28, 2023
Case Number: 23-cv-5708
Judge Frederic Block
Magistrate Judge James R. Cho

**ANTONIA M. APPS**
**REGIONAL DIRECTOR**
Tejal D. Shah
Lindsay S. Moilanen
Abigail E. Rosen
John C. Lehmann
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
212-336-0473 (Rosen)
RosenAb@sec.gov

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　　　　　Plaintiff,<br><br>　-against-<br><br>MINA TADRUS and<br>TADRUS CAPITAL LLC,<br><br>　　　　　　　　　Defendants, | **COMPLAINT**<br><br>23 Civ. \_\_\_\_\_ (     )<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendants Mina Tadrus ("Tadrus") and Tadrus Capital LLC ("Tadrus Capital") (collectively, "Defendants"), alleges as follows:

**SUMMARY**

1.　Defendants Tadrus and Tadrus Capital—respectively, the founder and chief executive officer of an eponymous investment advisory firm and the firm itself—engaged in a multimillion-dollar Ponzi scheme.

2. Since at least September 2020 (the "relevant period"), Tadrus has solicited and sold investments in Tadrus Capital Fund LP ("Tadrus Fund") – a purported pooled investment vehicle – targeting members of the Egyptian Coptic Christian community. Defendants raised over $5 million from at least 31 investors.

3. Tadrus falsely told investors that their funds would be pooled and invested in "the world's first private high-yielding and fixed-income quantitative hedge fund" using "artificial intelligence-based high-frequency trading models" that would yield "investors 1.5% or 2.5%, paid on the first of each month, for an annual return on investment [return on investment] of 18% or 30% a year."

4. In reality, Defendants did not invest the vast majority of investors' funds, if any. Instead, Defendants used a significant portion of the investor funds for Tadrus' own personal benefit – diverting funds directly to Tadrus and to pay his personal credit card bills, and, made Ponzi payments – which they told investors were "guaranteed" monthly return on investment payments.

5. In total, during the relevant period, Defendants used approximately $1,431,900 of investors' money to pay investors the "guaranteed" monthly return on investment payments, including over $275,000 in June 2023 alone, and further misappropriated at least $383,267.93 of investors' money for Tadrus' own benefit.

**VIOLATIONS**

6. By virtue of the foregoing conduct and as alleged further herein, Defendants Tadrus and Tadrus Capital have violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77e(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1),

(2), and (4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), (2), and (4)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8(a)(2)].

7. Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

8. The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)]; Sections 21(d)(1) and 21(d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and 78u(d)(5)]; and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)].

9. The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants to disgorge all ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)]; (d) permanently prohibiting Tadrus from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; (e) permanently enjoining Tadrus from directly or indirectly, including, but not limited to, through any entity owned or controlled by Tadrus,

3

participating in the issuance, purchase, offer, or sale of any security, provided however, that such injunction shall not prevent Tadrus from purchasing or selling securities for his own personal account; and (f) ordering any other and further relief the Court may deem just and proper.

10. To maintain the *status quo* and preserve assets sufficient for Defendants to pay disgorgement, prejudgment interest, and civil penalties in accordance with any Final Judgment of this Court, the Commission further seeks emergency relief during the pendency of this action including: (a) freezing Defendants' assets; (b) requiring Defendants to provide the Commission with a sworn accounting; and (c) prohibiting Defendants from destroying, altering, concealing, or otherwise interfering with the access to relevant documents, books and records.

## **JURISDICTION AND VENUE**

11. This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], and Advisers Act Section 214 [15 U.S.C. § 80b-14].

12. Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

13. Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], and Advisers Act Section 214 [15 U.S.C. § 80b-14]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District. Among other things, Defendants solicited, offered, and sold securities to investors, including to investors residing in Brooklyn and Staten Island, and misappropriated investor funds through making personal purchases in the District.

**DEFENDANTS**

14.     **Tadrus Capital**, incorporated in June 2020 in New York, has its principal places of business in New York, New York, and Tampa, Florida.  Tadrus Capital has a website, TadrusCapital.com ("Tadrus Capital website").  Tadrus Capital is solely controlled by Tadrus.

15.     **Tadrus**, age 36, is presently a resident of Tampa, Florida, where he has resided since 2022.  Prior to that, and during the fraudulent conduct alleged here, Tadrus resided in Brooklyn, New York, founded Tadrus Capital and served as its CEO since its inception.  Tadrus was a registered representative associated with a registered broker-dealer located in New York, New York, from July 2018 to April 2019.  He is not currently associated with any firm registered with the Commission.

**FACTS**

**I.     DEFENDANTS' PURPORTED OFFERING**

16.     Since at least September 2020, Tadrus and Tadrus Capital solicited and sold interests in Tadrus Fund – a purported pooled investment vehicle.

17.     These interests were sold to at least 31 investors, the vast majority of whom were Tadrus' relatives and/or members of the Egyptian Coptic Christian community, of which Tadrus was also a member.

18.     Investment amounts varied per investor from $20,000 to $345,000, and totaled over $5 million.

19.     All investor funds were directed to accounts held in the name of Tadrus Capital, not Tadrus Fund.  Tadrus never segregated money by investor.

20.     Defendants operated a website at TadrusCapital.com, that was changed at Tadrus' direction several times.

21. In the version of the Tadrus Capital website available as of March 16, 2023, Tadrus made certain public statements, including that:

   a. Tadrus Capital was a "global quantitative alternative investment manager";

   b. Tadrus Capital "invest[ed] our clients' capital in multiple quantitative investment strategies, including a fully systematic quantitative global macro investment program covering all asset classes";

   c. Tadrus Capital employed a trading strategy involving trading "virtually 24/7," using "stop losses" and "short s[ales]."

22. The March 16, 2023 version of the Tadrus Capital website also provided a "Live Track Record" table showing a purported historical return on investment for Tadrus Capital. According to that table, Tadrus Capital made a consistent 7.5% return in every quarter since the second quarter of 2019, as shown below:

## Live Track Record

| Year | Q1   | Q2   | Q3   | Q4   | Total |
|------|------|------|------|------|-------|
| 2019 |      | 7.5% | 7.5% | 7.5% | 22.5% |
| 2020 | 7.5% | 7.5% | 7.5% | 7.5% | 30%   |
| 2021 | 7.5% | 7.5% | 7.5% | 7.5% | 30%   |
| 2022 | 7.5% | 7.5% | 7.5% | 7.5% | 30%   |
| 2023 | 7.5% |      |      |      |       |

23. The March 16, 2023 version of the Tadrus Capital website also included the below "Offering" table:

## Offering

| | |
|---|---|
| Fixed Monthly ROI | 1.5 - 2.5% |
| Annual ROI | 18 - 30% |
| Minimum Commitment | $150,000 - $250,000 |
| Commitment Period | 2 Years |
| Assets | Exchange Traded |
| Liquidity | High |
| Risk | Low |
| Absolute Returns | Yes |
| Fixed Income | Yes |
| Paid Monthly | Yes |

24. From approximately September 2020, Tadrus made oral representations to investors in soliciting their investments. These included representations that:

    a. Investors were required to invest a minimum amount;

    b. Investors would receive a flat rate monthly return on investment over the course of their investment;

    c. The fund utilized "stop losses" to be "cautious";

    d. The fund had a "risk adverse" approach to investing;

    e. The fund was invested in "commodities and currencies";

    f. Investors' funds were "locked in" for two years;

    g. Defendants' compensation was based on the difference between the investment return and the amount that he had to pay out in monthly return on investment payments;

    h. Defendants used a proprietary algorithm to invest investor funds;

    i. The investments were generating positive returns as evidenced by the monthly return on investment payments; and

    j. The investors' principal would be returned to them after the agreed-to lockup period ended.

25. In addition to the representations on the Tadrus Capital website and Tadrus' oral representations, since at least February 2022, Defendants entered into written agreements with at least 21 of the investors: an Agreement of Limited Partnership of Tadrus Capital Fund LP, and a Private Offering Memorandum for Tadrus Capital Fund LP (the "Offering Documents"). Tadrus sent or directed others to send the Offering Documents to investors. Those agreements provided that:

    a. The offering to investors were "securities" that had "not been registered under the Securities Act of 1933…or any state securities law";

    b. The Partnership's securities "valuation is determined by reference to actual transactions in the securities on any exchange or similar platform which the securities are traded" or, among other ways, "the securities are valued by the General Partner in good faith";

    c. Tadrus Capital, the General Partner of the Tadrus Fund, acted as a "fiduciary";

    d. Tadrus Capital would be paid a "management fee during each Fiscal Year equal to 2% per annum of each Limited Partner's Capital Account";

8

e. Tadrus Capital would be operated in "good faith and in the best interests of the Partnership";

f. The Partnership offered to investors was a "pooled investment fund[]";

g. The "principal investment objective" was to achieve capital growth by "investing in various types of investments included exchange and non-exchange traded assets, and tangible and nontangible assets";

h. The trading strategy involved trading in products such as "cryptocurrencies such bitcoins, commodities, futures, equities, bonds, ETFs, ETNs, credit, inverse ETFs, inverse ETNs, leveraged ETFs, leveraged ETNs, options, currencies, other exchange traded assets, non-exchange traded assets, real estate investments, peer-to-peer lending, other tangible investments, diamonds, car dealerships, venture capital, private equity, startups, illiquid assets, high risk assets";

i. That each investment was "rigorously researched" and "continuously monitored" by Tadrus Capital; and

j. That all investment decisions were made at the discretion of the Tadrus Capital.

26. In addition, the Offering Documents provided to investors prior to March 2022 promised a "guaranteed" monthly return of 4%.

27. The Offering Documents provided to investors after March 2022 promised either "guaranteed" or "targeted" monthly returns of 1.5% to 2.5%.

28. In addition, including in or around August of 2022, Tadrus solicited at least one investor on Instagram.

9

29. Through the course of their conduct, the Defendants did not provide investors with any monthly or quarterly statements. Instead, Defendants created an Investor Portal on the Tadrus Capital website to allow investors to see their account information which investors understood was updated monthly.

## II. DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS TO INVESTORS

30. Despite the statements made on Tadrus Capital's websites, in the Offering Documents, and by Tadrus regarding Tadrus Capital making investments in various investment products, as Defendants knew or recklessly disregarded, no such investments were made. A very small portion – less than 2% – of investor funds were transferred out of Tadrus Capital's bank accounts to a cryptocurrency trading platform and a foreign exchange trading platform located in the Cayman Islands. However, no funds were ever transferred into Tadrus Capital's bank accounts from the cryptocurrency trading platform or the foreign exchange trading platform, indicating that if the transfers to those entities were indeed investments, no profits were made on those investments.

30. Despite the statements made on Tadrus Capital's websites, in the Offering Documents, and by Tadrus regarding Tadrus Capital having an enumerated trading strategy, as Defendants knew or recklessly disregarded, no such strategy was employed.

31. As Defendants knew or recklessly disregarded, contrary to Defendants' statements to investors, they did not have any trading algorithm guiding actual investment decisions, proprietary or otherwise.

32. Tadrus Capital retained several unpaid interns to try to develop a trading strategy for Tadrus Capital using the cTrader, an algorithmic trading platform. The interns' trading strategies were never used for live trading; rather they engaged in "paper trading" to test the

profitability of their strategies, using significant margin, without the actual use of capital. In July 2022, Tadrus instructed the interns to stop using Google chat to communicate, and to use Telegram instead. Tadrus set the Telegram messages to auto-delete after a week. In December 2022, Tadrus informed interns working for Tadrus Capital that no algorithms were operating, and that they needed to get the algorithms ready for trading soon or the Fund would need to be shut down.

33. In addition, the Offering Documents' promise that investments were researched and monitored, as Defendants knew or recklessly disregarded, was false and misleading, as no investments were made.

34. The "Live Track Record" table on Tadrus Capital's website was false. As Defendants knew or recklessly disregarded, first, Tadrus Capital did not engage in trading or generate any profits, let alone steady 7.5% returns. Second, Tadrus Capital was not formed or operating going back as far as 2019. Third, even if the purported returns were true, they would not have been sufficient to cover the "guaranteed" 4% return on investment payments.

35. By May 31, 2023, seven days after the Commission first spoke to a potential investor, the Tadrus Capital website was edited to remove, among other things, the Live Track Record mentioned above. By July 27, 2023, Defendants had taken down their website altogether.

36. The Defendants' alleged fee structure was false. The Defendants described the fee structure differently in the Offering Documents and in oral representations. In the Offering Documents, the Defendants indicated that the fee would be 2% of the investment amount, taken at the beginning of the year. In oral representations, Tadrus indicated that he would take a fee based on the amount he earned on the investments over the guaranteed returns. These statements

were contradictory, and were both false, in light of the fact that Defendants did not invest the funds and misappropriated investor money.

37. Defendants knew or recklessly disregarded the fact that the statements in the Offering Documents about how they would value their securities were false, as they held no securities.

38. Defendants knew or recklessly disregarded that their representations to investors about the source of return on investment payments (*i.e.*, trading profits), were false. As described below, those payments were made from other investors' funds.

39. Tadrus' oral statements to investors that the Defendants utilized stop losses to be cautious, and engaged in a risk adverse investment strategy were false, as Defendants did not invest at all, and did not utilize stop losses.

### III. DEFENDANTS' USE OF INVESTOR FUNDS

40. Between September 2020 and the present, Defendants raised a total of at least $5,263,500 from investors purportedly for interests in Tadrus Fund.

41. During that period, Defendants made $1,431,900 in Ponzi payments to investors from Tadrus Capital's bank accounts as purported "guaranteed" return on investment payments.

42. As Defendants knew or recklessly disregarded, these return on investment payments were made from other investor funds and not from trading profits.

43. During that period, Tadrus has misappropriated at least $383,267.93 of investor funds by using the funds for personal expenses such as meals at restaurants, car payments, purchases at luxury retailers, and large donations to religious institutions.

44. As Tadrus knew or recklessly disregarded, he was not entitled to these funds as they did not represent either the 2% upfront fee or the "excess trading profits" he told investors he was taking as a fee.

12

## IV.     DEFENDANTS' CURRENT FINANCIAL STATUS

45.     As of June 30, 2023, $809,566.08 remained in one of Tadrus Capital's bank accounts, and $1,278,415.28 remained in another Tadrus Capital account.

46.     In the month of June 2023 alone, Defendants transferred $277,479.29 out of the same bank account to pay purported return on investment payments to investors and for personal expenses, including credit card payments.

### FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)

47.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 46.

48.     Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

49.     By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

### SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

50. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 46.

51. Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

52. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
**Violations of Advisers Act Sections 206(1) and (2) and 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder**

53. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 46.

54. At all relevant times, Defendants were investment advisers under Advisers Act Section 202(11) [15 U.S.C. § 80b-2(11)].

55. By engaging in the conduct described above, Defendants, while acting as investment advisers, by use of the means and instrumentalities of interstate commerce and of the mails, directly or indirectly:

a. knowingly or recklessly employed devices, schemes, or artifices to defraud clients and prospective clients; and/or

b. knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operate as a fraud or deceit upon clients and prospective clients; and

c. engaged in acts, practices, or courses of business which are fraudulent, deceptive or manipulative.

56. By engaging in the foregoing conduct, Defendants violated, and unless restrained and enjoined, will continue to violate Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter:

### I.

An Order temporarily and preliminarily, and a Final Judgment permanently enjoining Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a)(2) [15 U.S.C. §§ 77e(a)], Exchange Act Section 10(b) [15 U.S.C. §§ 78j(b)], and Rule 10b-5(b), thereunder [17 C.F.R. §§ 240.10b-5(b)], and 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8];

### II.

An Order temporarily and preliminarily, through a Final Judgment, freezing the Defendants' assets;

### III.

An Order requiring Defendants to submit a verified accounting of the Defendants' assets and the use of all investor funds raised by Defendants;

### IV.

An Order temporarily, and preliminarily, through a Final Judgment, enjoining Defendants and any person or entity acting at their direction or on their behalf, from destroying, altering, concealing, or otherwise interfering with the access to relevant documents, books and records;

### V.

A Final Judgment ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

### VI.

A Final Judgment ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)];

### VII.

A Final Judgment permanently prohibiting Tadrus from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)];

### VIII.

A Final Judgment permanently enjoining Tadrus from directly or indirectly, including, but not limited to, through any entity owned or controlled by Tadrus, participating in the issuance, purchase, offer, or sale of any security, provided however, that such injunction shall not prevent Tadrus from purchasing or selling securities for his own personal account; and

**IX.**

A Final Judgment granting any other and further relief this Court may deem just and proper.

**JURY DEMAND**

The Commission demands a trial by jury.

Dated: New York, New York
July 28, 2023

/s/ Antonia Apps
ANTONIA M. APPS
REGIONAL DIRECTOR
Tejal D. Shah
Lindsay S. Moilanen
Abigail E. Rosen
John C. Lehmann
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
212-336-0473 (Rosen)
RosenAb@sec.gov