UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION<br><br>Plaintiff,<br><br>-against-<br><br>MINA TADRUS and TADRUS CAPITAL LLC,<br><br>Defendants. | **MEMORANDUM AND ORDER**<br><br>Case No. 23-CV-5708 (FB) (JRC) |

*Appearances:*
*For the Plaintiff*:
ABIGAIL E. ROSEN
Securities and Exchange Commission
New York Regional Office
100 Pearl Street
New York, NY 10004

*For the Defendants*:
JORGE M. MARQUEZ
JON-JORGE ARAS
CHRISTOPHER WARREN
518 8th Avenue, 25th Floor
New York, NY 10018

**BLOCK, Senior District Judge:**

In this civil enforcement action regarding an alleged Ponzi scheme brought by the Securities and Exchange Commission ("SEC"), Defendants Mina Tadrus ("Tadrus") and Tadrus Capital LLC ("Tadrus Capital") (collectively, "Defendants") move to access frozen funds for living expenses and attorney's fees. For the following reasons, Defendants' motion is DENIED.

1

## I.     BACKGROUND

Tadrus is the founder and chief executive officer ("CEO") of Tadrus Capital, a purported hedge fund. Tadrus raised over $5 million from 31 investors predominantly from the Egyptian Coptic Christian community, of which Tadrus is also a member. Compl. ¶¶ 2, 17. He represented to investors that their funds would be invested in "the world's first private high-yielding and fixed-income quantitative hedge fund" using "artificial intelligence-based high-frequency trading models," which would yield "investors 1.5% or 2.5%, paid on the first of each month, for an annual return on investment of 18% or 30% a year." *Id.* at ¶ 3.

After serving a subpoena on Tadrus Capital in June 2023,[1] the SEC commenced this civil action in July 2023, alleging that Defendants engaged in a "multimillion-dollar Ponzi scheme" and misappropriated investors' funds that violated several provisions of the relevant securities laws. Specifically, the SEC alleges that Tadrus did not invest the vast majority of investors' funds and instead diverted the money to himself and to his personal credit card bills. And to make the monthly guaranteed monthly return on "investment" payments, Defendants paid investors using other investor funds. In connection with the same course of

---

[1] At various points in their papers, Defendants protest the SEC's decision to file a civil complaint before Defendants fully responded to the SEC subpoena. However, the Court is unaware of — nor do Defendants provide — any authority precluding the SEC from filing a lawsuit without warning Defendants about its intention to do so or before Defendants could fully respond to the subpoena.

conduct that gave rise to this civil action brought by the SEC, the United States Attorney's Office charged Tadrus on a criminal complaint and unsealed the indictment in September 2023. That case is also pending in the Eastern District, before Judge Gonzalez. *See United States v. Mina Tadrus*, 23-cr-393 (HG). On November 2, 2023, this Court granted the government's unopposed motion to intervene and stay civil proceedings because of the pendency of the parallel criminal case.[2]

In August 2023, after the SEC filed its Temporary Restraining Order ("TRO") papers, the Court entered the parties' Consent Order Imposing Preliminary Injunction and Other Relief ("Consent Order"), which agreed, *inter alia*, that Defendants' assets would be frozen until the Court issues a final judgment in the action.

The Consent Order identified two issues on which the parties could not agree: (1) whether Tadrus could use investor funds for living expenses; and (2) whether Defendants could use funds in two accounts controlled by Defendants to pay attorney's fees in connection with this action. Accordingly, Defendants now move for Court authorization of: (1) $29,186.56 of funds from what was a joint bank account held by Tadrus and his wife so as to cover approximately 3 months

---

[2] The government did not object to the Court deciding Defendants' instant motion either prior to or after deciding its motion to intervene and stay proceedings.

of living expenses; (2) $150,000.00 to allow a proper accounting and cover legal fees and expenses necessary to avoid lopsided litigation; and (3) any other relief that the Court deems just and proper under the particular circumstances of this case.

      Defendants claim that authorization of use of these funds will enable the parties to engage in meaningful settlement negotiations.  In their papers, Defendants deny all allegations of wrongdoing but claim they cannot adequately defend themselves against the SEC's civil complaint unless they have the resources to pay for living expenses and mount a successful defense, which, they claim, requires access to assets that are currently frozen.  And Defendants also highlight Tadrus's family circumstances, including his need to provide for his wife, two-year old daughter, and newborn son.

## II.  DISCUSSION

For both living expenses and attorney's fees,[3] a defendant must "establish [1] that the funds he seeks to release are untainted and [2] that there are sufficient funds to satisfy any disgorgement remedy that might be ordered in the event a violation is established at trial." *See S.E.C. v. Stein*, No. 07 CIV. 3125GEL, 2009 WL 1181061, at *1 (S.D.N.Y. Apr. 30, 2009) (declining defendant's motion to unfreeze assets to pay for attorney's fees and living expenses in alleged Ponzi scheme case); *see also S.E.C. v. Santillo*, No. 18-CV-5491 (JGK), 2018 WL 3392881, at *4-5 (S.D.N.Y. July 11, 2018) (stating and applying standard to deny defendant's request to unfreeze assets to pay for legal expenses in SEC civil enforcement action). The touchstone for this inquiry is "equity," and Defendants carry the burden. *See Stein*, 2009 WL 1181061, at *1 (stating that "defendant has not met his burden").

---

[3] Because of Sixth Amendment right-to-counsel considerations, the caselaw has distinguished two different standards in assessing whether to unfreeze funds for attorney's fees. In civil cases, including an SEC civil enforcement action like this one, the applicable standard is "whether or not the funds are tainted by fraud"; by contrast, in a criminal action, the SEC is "required to demonstrate that the frozen funds are traceable to fraud." *See S.E.C. v. FTC Cap. Mkts., Inc.*, No. 09 CIV. 4755 (PGG), 2010 WL 2652405, at *7 (S.D.N.Y. June 30, 2010) (citing *S.E.C. v. Coates*, No. 94 CIV. 5361 (KMW), 1994 WL 455558, at *3 (S.D.N.Y. Aug. 23, 1994)). While Tadrus faces a separate criminal action in the Eastern District before Judge Gonzalez, in the civil action before this Court, Defendants do not claim that they need funds for mounting a criminal defense. Accordingly, the Court uses the applicable standard in the civil context, whether the funds are untainted by the SEC's allegations of fraud.

### A. Whether the funds are untainted by the SEC's allegations

Defendants must first establish that the funds they seek to release are "untainted by the [SEC's] allegations" of fraud. *See Stein*, 2009 WL 1181061, at *1; *see also S.E.C. v. FTC Cap. Mkts., Inc.*, No. 09 CIV. 4755 (PGG), 2010 WL 2652405, at *7 (S.D.N.Y. June 30, 2010) (collecting cases regarding the proper standard in civil suits). As the Second Circuit recently stated, "[i]t is well-settled that a defendant has no right to use tainted assets for his legal defense" in criminal cases, let alone civil ones. *S.E.C. v. Ahmed*, 72 F.4th 379, 395 (2d Cir. 2023).

The Court first notes that the SEC has made a substantial showing that Defendants defrauded investors through a Ponzi scheme. While the SEC's claims have not yet been "authoritatively resolved," the SEC need not conclusively demonstrate that the frozen funds are traceable to fraud at this early juncture to preclude Defendants' use of frozen assets in a civil case. *Compare Stein*, 2009 WL 1181061, at *1 (in civil case, "defendant must establish" that the funds he seeks to release are untainted, even just weeks after the SEC had instigated current action) *with FTC Cap. Mkts., Inc.*, 2010 WL 2652405, at *7 (in a criminal action, because of Sixth Amendment concerns, the SEC is "required to demonstrate that the frozen funds are traceable to fraud" when defendant is seeking to unfreeze funds for attorney's fees). Instead, Defendants must establish that the assets in question are untainted by their alleged fraud.

Defendants seek funds from two accounts identified in the Consent Order: (1) a personal bank account held in Tadrus's own name and (2) accounts held in Tadrus Capital's name at two financial institutions. In the Consent Order, Defendants concede that the funds in Tadrus's personal bank account, currently held in escrow by his counsel, are "investor funds," *see* Consent Prelim. Inj. at 2 ("the parties have not come to an agreement as to . . . whether Tadrus can use the *investor funds* in the accounts listed in Schedule C for his living expenses") (emphasis added), and the SEC claims to have traced all the funds in the Tadrus Capital accounts to investors.

Defendants do not explicitly contend that the funds are untainted. Rather, they argue that the matter is "still at an early state" in the litigation and that finding that all of the funds were tainted would necessarily imply that the Court already agrees with the SEC that Defendants are guilty, which would "raise[] serious due process concerns." Finally, Defendants contend that because 90% of the funds are accounted for, the "fact that such a high level of funds appears accounted for should give anyone pause as to whether Defendants truly had the intent to defraud investors and whether the entirety of funds should be considered 'tainted funds' at this stage of the proceeding." The SEC counters that neither it nor the Defendants have been unable to identify any untainted funds in Defendants' possession.

Defendants have failed to meet their burden of establishing that the funds are untainted by the alleged fraud. Indeed, they fail to argue that either account contains funds other than from investors, instead using the "fact that such a high level of funds appears accounted for" to cast doubt on whether Defendants "truly had the intent to defraud investors." But casting doubt on the ultimate merits of the SEC's allegations is insufficient to meet their burden. *See Stein*, 2009 WL 1181061, at *1 ("Stein's efforts to identify assets untainted by the Commission's allegations are woefully inadequate.").

Defendants protest that a finding that the funds are tainted would necessarily imply that the Court agrees with the SEC that the Defendants are guilty of the purported misconduct. Here, however, Defendants not only mischaracterize the applicable standard — Defendants have the burden of showing that the funds are untainted by the SEC's *allegations*, which is worlds apart from the Court expressing an opinion on the ultimate merit thereof — but also, more fundamentally, misunderstand the purpose of freezing assets. In freezing Defendants' assets, the Court is not reaching a judgment on the merits but is instead merely acting "to preserve the status quo . . .[and] to protect the public interest" by maintaining funds for a *possible* equitable remedy of disgorgement. *S.E.C. v. Schiffer*, No. 97 CIV. 5853 (RO), 1998 WL 901684, at *3 (S.D.N.Y. June 25, 1998) (quoting *S.E.C. v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1106 (2d

Cir. 1972)). Stated differently, the objective of temporarily freezing assets is to protect investors' interests so that, *if the SEC ultimately prevails*, funds are available for disgorgement. The freeze order does not, however, presume that the SEC will ultimately prove its case,[4] and the Court's refusal to release temporarily frozen funds does not implicate due process.[5]

### B. Whether the frozen funds can meet potential disgorgement liability

Defendants must also establish that there are sufficient funds to satisfy any disgorgement remedy that might be ordered in the event a violation is established at trial. Here, courts have held that "assets should remain frozen when the defendant has not demonstrated that there are sufficient frozen assets to pay disgorgement." *Santillo*, 2018 WL 3392881, at *4. This issue alone can be dispositive, regardless of whether the funds are traceable to a defendant's fraudulent conduct. *See, e.g.*, *S.E.C. v. Callahan*, No. 12CV1065ADSAYS, 2015 WL 10853927, at *2 (E.D.N.Y. Dec. 24, 2015) ("The fact that the Schwab account may not contain funds tainted by Callahan's fraud is of no moment" for denying

---

[4] For this reason, the caselaw on which Defendants rely is plainly inapposite. *United States v. Priv. Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 793 F. Supp. 1114, 1151 (E.D.N.Y. 1992), concerns the permissible breadth of disgorgement as a civil remedy in a RICO case, not a *temporary* freeze order of assets. *Id.*

[5] To the extent Defendants have concerns that they are "facing the prospect of not even being able to put forth a proper defense that would present their legal and factual position," presumably because of their inability to access investor funds to pay attorney's fees, the Court reminds them that they have "no constitutional right to counsel in this civil enforcement action." *See Ahmed*, 72 F.4th at 395.

9

request to partially lift the asset freeze to obtain funds from his Schwab account to pay his legal expenses.); *S.E.C. v. Forte*, 598 F. Supp. 2d 689, 693 (E.D. Pa. 2009) ("[B]ecause it appears likely that the investor losses dwarf Defendant's remaining assets, even if Defendant could show that some of the frozen funds are from 'untainted' sources, I would not release those funds.").

Once again, Defendants have failed to meet their burden. In fact, both parties appear to agree that investors cannot be made whole from the assets frozen in this matter. Defendants state that "almost 90% of the total amount of investor funds are accounted for," implying at least a 10% gap, or at least several hundred thousand dollars, between the total investor funds and the amount accounted for. Similarly, the SEC estimates that the likely disgorgement figure liability[6] totals $4,070,350, far greater than the $3,361,775.25 currently frozen and thus ultimately available to investors.

Accordingly, because Defendants fail to show, let alone argue, that there are sufficient frozen funds for potential disgorgement liability, they have failed to meet their burden. *See Ahmed*, 72 F.4th at 394 (2d Cir. 2023) ("The district court did not abuse its discretion by declining to unfreeze assets for Ahmed to hire counsel. .

---

[6] Citing relevant caselaw, *see S.E.C. v. Arias*, No. 12CV2937MKBSIL, 2021 WL 7908041, at *5 (E.D.N.Y. Nov. 11, 2021), *report and recommendation adopted*, No. 12CV2937RPKSIL, 2023 WL 1861641 (E.D.N.Y. Feb. 9, 2023), the SEC calculates disgorgement liability by subtracting the amount of money returned to investors from the total amount fraudulently raised from investors.

. . [T]he district court properly calculated disgorgement, so it did not abuse its discretion by concluding that there were no frozen funds available for Ahmed to hire counsel."). Indeed, a Southern District court barred defendants from utilizing frozen assets to pay legal fees associated with representation in a civil action even when it was unclear "whether the frozen assets exceed the SEC's request for damages or disgorgement." *See S.E.C. v. Bremont*, 954 F. Supp. 726, 733 (S.D.N.Y. 1997) (denying defendants' request to use funds they allegedly improperly attainted from investors for attorney's fees). Here, where Defendants all but concede that the frozen assets do not exceed the SEC's disgorgement estimate, Defendants' motion must fail.

And while Defendants attempt to hang their hat on the claim that "almost 90% of the total investor funds are accounted for," a gap between potential disgorgement liability and available funds is a gap nonetheless, and any "contextualization of the numbers," as Defendants urge, would be cold comfort to allegedly defrauded investors. *Cf. S.E.C. v. Current Fin. Servs.*, 62 F. Supp. 2d 66, 68 (D.D.C. 1999) (frozen assets of $44,000 "clearly do not exceed plaintiff's approximation of liability" of $156,997.28, "and thus, the Court will continue the freeze order"). As the frozen assets fall short of the likely potential disgorgement sum, Defendants' arguments must fail.

11

Although Defendants' failure to meet their burden on either of these two issues — whether the funds are untainted and whether there are sufficient assets to cover potential disgorgement — is alone dispositive, *see Stein*, 2009 WL 1181061, at *1 ("To persuade a court to unfreeze assets, the defendant must establish that the funds he seeks to release are untainted *and* that there are sufficient funds to satisfy any disgorgement remedy that might be ordered in the event a violation is established at trial") (emphasis added), the Court notes that other factors would also weigh against unfreezing the funds. *See Santillo*, 2018 WL 3392881, at *2 ("A defendant may seek a modification of an asset freeze if the modification is in the interest of the defrauded investors."). Because of the gulf between the estimated disgorgement liability and the current frozen assets, unfreezing assets would not be in the best interest of defrauded investors. And unlike in cases where courts determine that unfreezing the assets of business not alleged to be part of the Ponzi scheme is in the best interest of investors because maintaining such assets could help repay defrauded investors, unfreezing allegedly tainted assets here would only further deplete the available total for disgorgement. *Cf. id.* ("Importantly, Santillo does not request to unfreeze any assets gained through his alleged fraud."). Additionally, while the Court need not consider these other factors because Defendants have been unable to establish (1) that the money is untainted by allegations of fraud and (2) that sufficient funds exist to meet

12

potential disgorgement obligations, *see Stein*, 2009 WL 1181061, at *2 (finding it necessary to address only these two issues), it notes that even if it did balance the interests and consider the expenses Defendants seek to pay, it would reach the same outcome.

### III.   CONCLUSION

While the Court empathizes with the situation of Tadrus's family, there is no legal basis for unfreezing allegedly tainted assets, especially where the currently frozen assets cannot cover likely disgorgement liability.  For the foregoing reasons, Defendants' motion to access frozen funds for living expenses and attorney's fees is DENIED.

**SO ORDERED.**

 /S/ Frederic Block
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
November 2, 2023